## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EXCO RESOURCES, INC., *et al.*,[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 18-30155 (MI) |
| | ) | |
| GEN IV INVESTMENT OPPORTUNITIES, LLC and VEGA ASSET PARTNERS, LLC, | ) ) | (Jointly Administered) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 18-_____ |
| | ) | |
| FAIRFAX FINANCIAL HOLDINGS LIMITED; ADVENT CAPITAL (NO. 3) LTD.; BRIT REINSURANCE (BERMUDA) LIMITED; BRIT SYNDICATES LIMITED; CLEARWATER SELECT INSURANCE COMPANY; FAIRFAX FINANCIAL HOLDINGS MASTER TRUST FUND; FEDERATED INSURANCE COMPANY OF CANADA; NEWLINE CORPORATE NAME LIMITED; NORTHBRIDGE GENERAL INSURANCE CORPORATION; NORTHBRIDGE PERSONAL INSURANCE CORPORATION; ODYSSEY REINSURANCE CORPORATION; TIG INSURANCE COMPANY; TIG INSURANCE (BARBADOS) LIMITED; UNITED STATES FIRE INSURANCE COMPANY; WENTWORTH INSURANCE COMPANY LTD.; ZENITH INSURANCE COMPANY; ZENITH INSURANCE COMPANY and ENERGY STRATEGIC ADVISORY SERVICES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295). The location of the Debtors' service address is: 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

Plaintiffs Gen IV Investment Opportunities, LLC ("Gen IV") and VEGA Asset Partners, LLC ("VEGA," and together with Gen IV, the "Plaintiffs"), as secured creditors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of EXCO Resources, Inc. and its affiliated debtors-in-possession (collectively, "EXCO," the "Debtors," or the "Company"), respectfully submit this complaint (the "Complaint") and bring this action against defendants Fairfax Financial Holdings Limited ("Fairfax"), Advent Capital (No. 3) Ltd., Brit Reinsurance (Bermuda) Limited, Brit Syndicates Limited, Clearwater Select Insurance Company, Fairfax Financial Holdings Master Trust Fund, Federated Insurance Company of Canada, Newline Corporate Name Limited, Northbridge General Insurance Corporation, Northbridge Personal Insurance Corporation, Odyssey Reinsurance Corporation, TIG Insurance Company, TIG Insurance (Barbados) Limited, United States Fire Insurance Company, Wentworth Insurance Company Ltd., Zenith Insurance Company, and Zenith Insurance Company (collectively, the "Fairfax Subsidiaries," and together with Fairfax, the "Fairfax Defendants"), and Energy Strategic Advisory Services, LLC ("ESAS," and together with the Fairfax Defendants, the "Defendants").

## I.   PRELIMINARY STATEMENT

1.      By this action, Plaintiffs seek to remedy the harm caused by Defendants' control and exploitation of the Debtors that unfairly advanced their own financial interests to the detriment of Plaintiffs as disinterested secured creditors.  In the period leading up to the filing of the bankruptcy, Defendants misused their insider positions to pursue their own agendas and unfairly benefit themselves at the expense of Plaintiffs.  Adding insult to injury, the Debtors have now proposed a plan of reorganization that is premised on a "settlement" proposed to be funded by the very parties harmed by Defendants.  Plaintiffs are the Debtors' largest secured creditors

2

holding 1.5 Lien Notes (as defined below) and the 1.75 Lien Term Loan (as defined below) that *are not*, and *never have been*, affiliated with an insider or controlled by an insider of the Debtors.

2.     In the relevant period, before the Debtors' bankruptcy, despite the downward trajectory in the industry and the Company's business and the Company's excessively heavy debt load that rendered the Company insolvent, Defendants dictated corporate actions hostile to creditors.   Such actions included, for example, blocking any proposed in-court restructuring in favor of financing transactions that saddled the Company with even more debt without improving the Company's liquidity, while placing *Defendants* in a better financial position for the inevitable restructuring.

3.     Defendants Fairfax and ESAS[2] are two large investors that (together with their affiliates) abused their insider status and/or access to inside information to benefit themselves to the detriment of Plaintiffs and other creditors.  Of the approximately $317 million of 1.5 Lien Notes outstanding, the Fairfax Defendants hold approximately $160 million and ESAS holds approximately $74 million.  Of the approximately $709 million of the 1.75 Lien Term Loan outstanding, the Fairfax Defendants hold approximately $417.9 million (all of the approximately $311.5 million "Fairfax" tranche and approximately $116.4 million of the "Exchange" tranche), and ESAS holds approximately $49.7 million of the "Exchange" tranche. Defendants were also significant equity holders during the relevant period, with the Fairfax Defendants holdings more than 16% of the Company's shares and ESAS eventually holding more than 6% of the Company's shares.[3]

---

[2]     Defendant ESAS is a wholly owned subsidiary of Bluescape Resources Company LLC ("Bluescape"). Bluescape effectively used ESAS as its investment vehicle in respect of the Company.

[3]     Taking into account certain warrants that ESAS received and could have possibly exercised ESAS's potential equity ownership stake increases to approximately 24% of the Company.

AMERICAS 95567050

4.      During the relevant period, Defendants aggressively exploited their control and influence over EXCO to the detriment of disinterested creditors, including Plaintiffs. Specifically, Defendants, through their designated representatives on EXCO's board of directors (the "Board"), including ESAS's representative, Charles John Wilder, Jr. ("Wilder"), acting as EXCO's Executive Chairman, repeatedly stood on both sides of various financing transactions "negotiating" favorable terms for themselves and otherwise manipulating the Debtors to take actions that were designed to principally benefit Defendants.

5.      Like many exploration and production companies in the period of 2015 to 2017, EXCO was floundering due to an excessively heavy debt load, onerous minimum volume transportation contracts, cash-burning operations, and low commodity prices. Unlike its peers, EXCO did not elect to restructure its operations or its balance sheet through chapter 11 bankruptcy at that time because that is not what Defendants believed maximized their *own* financial interests. Instead, Defendants and the insiders affiliated with Defendants misused their insider status in a repeated pattern of misconduct designed to benefit Defendants unfairly:

- In 2015, instead of pursuing a bankruptcy that would have placed EXCO in a more financially advantageous position, Defendants forced EXCO to pursue a refinancing transaction with Fairfax on non-market terms that also gave Fairfax control over further restructuring options.





6.      Defendants' actions caused substantial harm to Plaintiffs through, *inter alia*, self-dealing, improperly manipulating the corporate process by which EXCO's corporate decisions were made, and otherwise acting in a manner inconsistent with, and in flagrant breach of, the fiduciary duties of their affiliated Board members. The foregoing misconduct requires equitable subordination of Defendants' claims to the claims of Plaintiffs arising out of the 1.5 Lien Notes and 1.75 Lien Term Loan pursuant to section 510(c) of the Bankruptcy Code (as defined below).

7.      Since the filing of bankruptcy, Defendants have pursued an agenda designed to whitewash their prior inequitable and bad faith conduct. Faced with the threat of litigation arising from their prepetition misconduct,[4] Defendants—in conjunction with the Debtors—negotiated a proposed settlement that releases and avoids any potential claims related to Defendants' prepetition wrongdoing. The proposed settlement has been incorporated into a plan of reorganization that improperly requires Plaintiffs and other non-insider-affiliated 1.75 Lien Term Loan lenders to foot the bill.

8.      Specifically, the proposed settlement provides Defendants with a full release while requiring all 1.75 Lien Term Loan lenders to (a) contribute 18% of their recoveries to certain general unsecured creditors (other than deficiency claimants) and (b) waive their deficiency claims that would otherwise be entitled to participate in the recoveries to general

---

4



AMERICAS 95567050

unsecured creditors.  Debtors further propose to contribute a significant amount of estate money as part of the deal to release any claims against Defendants, even though that value should be distributed to the disinterested 1.75 Lien Term Loan lenders, including Plaintiffs.

9.      Under the auspices of the proposed settlement and resulting plan treatment, *all* of the 1.75 Lien Term Loan lenders are treated the same, regardless of whether they abused their positions as insiders or parties affiliated with insiders.  As a result, Defendants are seeking to benefit themselves by making disinterested secured creditors bear the costs of resolving claims that could be asserted against Defendants.  It is the misconduct of Defendants and their affiliated representatives that gave rise to the claims at issue, and Plaintiffs and other disinterested secured creditors should not be forced to subsidize or otherwise contribute to any proposed settlement necessitated by Defendants' bad acts.  Any ultimate treatment of Plaintiffs must be on the basis that they are secured lenders without any affiliation with insiders who never engaged in any of the misconduct or self-dealing that give rise to the claims and causes of action that Defendants and the Debtors seek to settle.

10.      To remedy Defendants' pattern of inequitable and bad faith conduct, including the abuse of their Board designees' insider positions to benefit themselves at the expense of other secured creditors, Plaintiffs request that Defendants' claims be equitably subordinated to all claims of Plaintiffs on their 1.5 Lien Notes and 1.75 Lien Term Loan.

II.      <u>**JURISDICTION AND VENUE**</u>

11.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

12.      The Court (as defined below) has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and *In re Order of Reference to Bankruptcy Judges,*

6

*General Order* of the District Court No. 2012-6 (S.D. Tex. May 24, 2012).  The matters set forth herein are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

13.     This adversary proceeding relates to *In re EXCO Resources, Inc.*, Case No. 18-30155 (MI) (Jointly Administered), under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), pending in the Houston Division of the United States Bankruptcy Court for the Southern District of Texas (the "Court").

14.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     Pursuant to Bankruptcy Local Rule 7008-1, Plaintiffs consent to the entry of final orders or a judgment by the Court in this adversary proceeding.

### III.     PROCEDURAL BACKGROUND

16.     On January 15, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code in the Court.[5]  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

17.     Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Chapter 11 Cases.

18.     On January 24, 2018, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") formed the Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 Cases.[6]

---

[5]      All references to the Docket will be to the main bankruptcy case (Case No. 18-30155 (MI)), unless otherwise specified.

[6]      See Docket No. 175, Notice of Appointment of Creditors Committee. One day later, the Committee was reconstituted with additional members.  See Docket No. 181, Notice of Reconstituted Committee of Unsecured Creditors.

AMERICAS 95567050

IV.   **PARTIES**

19.     Plaintiffs Gen IV and VEGA are Delaware entities with their principal place of business at 1700 Broadway, 35th Floor, New York, New York 10019.  Plaintiffs, together, own (a) approximately $42 million in principal amount of the 1.5 Lien Notes, (b) approximately $89 million in principal amount of the 1.75 Lien Term Loan, and (c) approximately $8.3 million in principal amount of the 2018 Notes (as defined below). Accordingly, Plaintiffs, together, are the third-largest secured creditor of the Debtors, and the Debtors' largest secured creditor that is *not now*, and *never has been*, affiliated with an insider of the Debtors.

20.     Defendant Fairfax is a Toronto, Canada based entity with its principal place of business at 95 Wellington Street West, Suite 800, Toronto, Ontario, Canada M5J 2N7. V. Prem Watsa ("Watsa") is the Founder, Chairman and Chief Executive Officer of Fairfax. Hamblin Watsa Investment Counsel Ltd. ("Hamblin Watsa") is a wholly owned subsidiary of Fairfax and is responsible for managing the investments of Fairfax and the Fairfax Subsidiaries.

21.     Defendant Advent Capital (No. 3) Ltd. is a London, England based entity and subsidiary of Fairfax with its principal place of business at 2 Minster Court, 2nd Floor, Mincing Lane, London EC3R 7BB, United Kingdom.

22.     Defendant Brit Reinsurance (Bermuda) Limited is a Bermuda entity and subsidiary of Fairfax with its principal place of business at Ground Floor, Chesney House, The Waterfront, 96 Pitts Bay Road, Pembroke, Hamilton HM 08, Bermuda.

23.     Defendant Brit Syndicates Limited is a company registered in England and Wales and subsidiary of Fairfax with its principal place of business at The Leadenhall Building, 122 Leadenhall Street, London EC3V 4AB, United Kingdom.

AMERICAS 95567050

24.     Defendant Clearwater Select Insurance Company is a Connecticut entity and subsidiary of Fairfax with its principal place of business at 300 First Stamford Place, Stamford, Connecticut 06902.

25.     Defendant Fairfax Financial Holdings Master Trust Fund is a Toronto, Canada based entity and subsidiary of Fairfax with its principal place of business at 95 Wellington Street West, Suite 802, Toronto, Ontario, Canada M5J 2N7.

26.     Defendant Federated Insurance Company of Canada is a Winnipeg, Canada based entity and subsidiary of Fairfax with its principal place of business at 255 Commerce Drive, Winnipeg, Manitoba, Canada R3C 3C9.

27.     Defendant Newline Corporate Name Limited is a London, England based entity and subsidiary of Fairfax with its principal place of business at Corn Exchange, 55 Mark Lane, London EC3R 7NE, United Kingdom.

28.     Defendant Northbridge General Insurance Corporation is a Toronto, Canada based entity and subsidiary of Fairfax with its principal place of business at 105 Adelaide Street West, Suite 700, Toronto, Ontario, Canada M5H 1P9.

29.     Defendant Northbridge Personal Insurance Corporation is a Toronto, Canada based entity and subsidiary of Fairfax with its principal place of business at 105 Adelaide Street West, Suite 300, Toronto, Ontario, Canada M5H 1P9.

30.     Defendant Odyssey Reinsurance Corporation is a Connecticut entity and subsidiary of Fairfax with its principal place of business at 300 First Stamford Place, Stamford, Connecticut 06902.

AMERICAS 95567050

31.     Defendant TIG Insurance Company is a California entity and subsidiary of Fairfax with its principal place of business at 250 Commercial Street, #5000, Manchester, New Hampshire 03101.

32.     Defendant TIG Insurance (Barbados) Limited is a Barbados entity and a subsidiary of Fairfax with its principal place of business at #12 Pine Commercial Centre, The Pine, St. Michael, Barbados, West Indies BB11103.

33.     Defendant United States Fire Insurance Company is a Delaware entity and subsidiary of Fairfax with its principal place of business at 305 Madison Avenue, Morristown, New Jersey 07962.

34.     Defendant Wentworth Insurance Company Ltd. is a Barbados entity and subsidiary of Fairfax with its principal place of business at #12 Pine Commercial Centre, The Pine, St. Michael, Barbados, West Indies BB11103.

35.     Defendant Zenith Insurance Company is a Toronto, Canada based entity and subsidiary of Fairfax with its principal place of business at 105 Adelaide Street West, Suite 700, Toronto, Ontario, Canada M5H 1P9.

36.     Defendant Zenith Insurance Company is a California entity and subsidiary of Fairfax with its principal place of business at 21255 Califa Street, Woodland Hills, California 91367.

37.     Defendant ESAS is a Delaware entity with its principal place of business at 200 Crescent Court, Suite 200, Dallas, Texas 75201.  ESAS is a wholly owned subsidiary of Bluescape.  Wilder serves as the Executive Chairman and sole Manager of Bluescape and indirectly controls ESAS.

AMERICAS 95567050

## V.  FACTUAL ALLEGATIONS

38.    Except where stated to be made on actual knowledge, allegations made herein are made on information and belief, matters of public record and inferences drawn from such sources. ████████████████████████████████████████████

████████████████ [7]

### A.    EXCO's Pre-2015 Refinancing Condition and Retention of Wilder.

39.    By late 2013 and early 2014, due to the continued deterioration of EXCO's financial condition, the Board began looking both for immediate new financing and longer-term restructuring options.  As of June 30, 2015, EXCO had drawn approximately $300 million on its first lien reserve based facility existing under that certain Amended and Restated Credit Agreement, dated as of July 31, 2013 (the "1L Credit Agreement" or "Revolver").  On February 6, 2015, the 1L Credit Agreement was amended to decrease the borrowing base from $900 million to $725 million.  On July 27, 2015, the 1L Credit Agreement was amended again, this time to decrease EXCO's borrowing base from $725 million to $600 million in connection with the semiannual borrowing base redetermination under the agreement.

40.    EXCO also had significant unsecured debt obligations.  EXCO had issued $750 million in principal amount of notes due 2018 bearing interest at the rate of 7.5% per annum (the "2018 Notes"), and $500 million in principal amount of unsecured notes due 2022 under another indenture bearing interest at 8.5% per annum (the "2022 Notes").  As a result, EXCO labored under significant annual debt service obligations.

---

[7]    Plaintiffs received the Draft Committee Complaint subject to the terms of the Confidentiality Agreement and Stipulated Protective Order [Docket No. 503] (the "Protective Order").  Under the terms of the Protective Order, parties may use material and information provided under the terms of the order in any proceedings arising out of or relating to the Debtors' Chapter 11 Cases, including any adversary proceeding.

41.     In early 2015, WL Ross, Fairfax, and Oaktree Capital Management, L.P. ("Oaktree") were substantial equity investors in EXCO, each with the ability to designate one member of the Board.  At that time, the Board was composed of six members: (1) the designees of the equity holders—Wilbur Louis Ross, Jr. (designated by WL Ross), Samuel A. Mitchell ("Mitchell," designated by Fairfax),[8] and B. James Ford (designated by Oaktree); and (2) three other directors—Jeffery D. Benjamin, Jeffery S. Serota, and Robert L. Stillwell.

42.     In the spring of 2015, EXCO retained Wilder, the Executive Chairman and Founder of Bluescape and a self-proclaimed "turnaround expert," to create a business plan and lead a restructuring.  Wilder's services were governed by that certain Services and Investment Agreement, dated March 31, 2015 (the "Original ESAS Services Agreement"), between EXCO and ESAS, a wholly owned subsidiary of Bluescape indirectly controlled by Wilder.  Under the Original ESAS Services Agreement, Wilder's compensation was comprised of a monthly fee of $300,000 and "incentive payments" of up to $2.4 million per year based on the performance of EXCO's common stock benchmarked against a peer group.  ESAS would receive warrants to purchase an aggregate of 80,000,000 common shares of EXCO at various strike prices above the then market price.  In addition, ESAS was given the right to designate Wilder to the Board as a director and executive chairman, a newly created position.  In exchange, ESAS agreed to: (i) purchase $10 million worth of common shares from EXCO at a price per share of $1.70; and (ii) purchase at least $40 million worth of additional common shares through open market purchases during the one year period following Wilder's hiring.

43.     ███████████████████████████████████

███████████████████████████████████████████████

---

[8]     While Mitchell was designated by Fairfax, he acted on behalf of all the Fairfax Defendants.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

44.     Nevertheless, on September 8, 2015, the Original ESAS Services Agreement was amended[9] (as amended, the "ESAS Services Agreement") to reduce ESAS's open market stock purchase obligation from $40 million to $13.5 million. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

45.     █████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

---

[9]     The Original ESAS Service Agreement was first amended by that certain Acknowledgement of Amendment, dated May 26, 2015 and effective as of March 31, 2015.

13

46.



### B.    The 2015 Refinancing.

47.     During the summer of 2015, a chapter 11 bankruptcy would have been in the best interests of EXCO.  In chapter 11 proceedings, EXCO could have, among other things, rejected the burdensome and wasteful above-market "minimum volume commitment" contracts, which called for tens of millions of dollars of unnecessary payments each year.   If EXCO had rejected burdensome contracts during a bankruptcy case in 2015, EXCO would have been able to save up to ▮▮▮▮▮▮ a year for the years 2015, 2016, and 2017, alone.   Had the Board been properly advised and not unduly influenced by Mitchell and Wilder (acting on behalf of Fairfax and Bluescape, respectively), it would have appropriately pursued a bankruptcy filing.  Instead, on information and belief, Mitchell and Wilder continually sought to avoid a bankruptcy filing to protect Defendants' financial interests.

---

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

AMERICAS 95567050

48. 

49.

50.     For example, to stave off bankruptcy, in the fourth quarter of 2015, *Fairfax* provided EXCO a 12.5% senior secured second lien term loan in an aggregate principal amount of $300 million (the "2L Fairfax Term Loan").  On information and belief, because of Fairfax's outsized role in the negotiations and Mitchell's influence on the Board, EXCO did not meaningfully test the market to obtain the best financing terms or seek an alternative financing. EXCO ultimately agreed to give Fairfax above-market terms, including with respect to the 12.5% interest rate and onerous "makewhole" provisions that would require the immediate payment of *all* interest that would be accrued under the 2L Fairfax Term Loan over the entire remaining term of the loan when triggered.

51.     Additionally, EXCO closed an exchange of 12.5% senior secured second lien term loan with certain of EXCO's then-unsecured noteholders in an aggregate principal amount of $291.3 million on October 26, 2015 and $108.7 million on November 4, 2016 (collectively, the "2L Exchange Loan"), pursuant to a term loan agreement, dated October 19,

2015 (as amended, restated, or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among EXCO, as borrower, the guarantor parties thereto, Wilmington Trust, National Association, as administrative agent and collateral trustee, and the other lender parties thereto. The exchange ratio used was 0.49 for the 2018 Notes and 0.39 for the 2022 Notes. The 2L Exchange Loan was secured by liens granted pursuant to mortgages, deeds of trust, and collateral instruments executed and recorded in 2015. Such liens are junior in priority to the liens securing the Revolver, and the subsequent liens securing the 1.5 Lien Notes and 1.75 Lien Term Loan. Together, the 2L Fairfax Term Loan and the 2L Exchange Loan comprised the "2015 Refinancing Transactions."

52.     The stated goal of the 2015 Refinancing Transactions was to "extend" EXCO's runway. In fact, covenants secured by Fairfax in the 2L Fairfax Term Loan gave Fairfax control over future restructuring negotiations. Fairfax obtained covenants that restricted EXCO's borrowing under the Revolver and provided Fairfax with the right to veto any future senior debt above $375 million. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

53.     After closing the deal, Fairfax would eventually purchase, directly or indirectly, a sufficient amount of the 2L Exchange Loan at discounted prices that, when

16

aggregated with the 2L Fairfax Term Loan, provided it with in excess of 50% of all of the outstanding second lien debt. This enabled Fairfax to control any matter that required consent from a majority of the second lien lenders.

54.    Had EXCO filed for bankruptcy in the summer of 2015, EXCO would have avoided annual payments of tens of millions of dollars for above market "minimum volume commitment" contracts, EXCO could have reduced its debt service obligations by equitizing its unsecured debt, and there would not have been hundreds of millions of dollars of additional secured debt piled on EXCO.

55.    Following the 2015 Refinancing Transactions, EXCO's funded debt consisted of: (1) a first lien reserve-based revolving credit agreement with a borrowing base and loan cap of $375 million; (2) a $300 million 2L Fairfax Term Loan, directly or indirectly, owed entirely to Fairfax; (3) a $400 million 2L Exchange Loan; (4) approximately $199 million of 2018 Notes; and (5) approximately $223 million of 2022 Notes.

### C.    Fairfax and Bluescape Took Control of EXCO's Capital Structure Post-2015 Refinancing.

56.    As a result of the 2015 Refinancing Transactions, Fairfax owned, directly or indirectly, 42.8% of EXCO's second lien debt. ██████████████████████

████████████████████████████████████████

██████████████████████    █████████████████████

██████████████████████████

57.    ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

17



58.

**D.**   **Fairfax and Bluescape Manipulated
the Board to Prevent a Chapter 11 Filing.**

59.

18



60.

61.     Faced with the need to restructure but apparently concerned with the appearance of impropriety and the need to conform to corporate governance norms, on May 13, 2016, the Board appointed a special committee (the "Special Committee") comprised of the three "independent" directors who were not affiliated with EXCO's equity holders, consisting of Robert L. Stillwell ("Stillwell"), Jeffery D. Benjamin ("Benjamin"), and Jeffery S. Serota ("Serota") (collectively, the "Independent Directors"). The Board explicitly tasked the Special Committee with considering various strategic and restructuring alternatives.

62.

63.

64.

65.

66.



AMERICAS 95567050

67. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

**E.** **Laying the Ground Work for the 2017 Restructuring.**

68. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

69. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████

70. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

21



71.

72.

F.     The ████████ Proposal.

73.

AMERICAS 95567050



74.

75.

76.

23



AMERICAS 95567050



81.

H.

82.

83.

25

AMERICAS 95567050



84.

85.

86.

11

26



87.

88.

AMERICAS 95567050



89.

90.

91.

28



92.

93.

AMERICAS 95567050

I.

94.

95.

96.

97.



AMERICAS 95567050



98.

J.

99.

100.

101.

102. 

103.

**K.      The 2017 Refinancing Transactions.**

104.    On March 15, 2017, EXCO issued approximately $300 million in 8.0%/11.0% 1.5 lien senior secured notes due March 2022 (the "1.5 Lien Notes") under an indenture, dated March 15, 2017 (as amended, restated, or otherwise modified from time to time, the "1.5 Lien Notes Indenture"), by and among EXCO, as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as indenture trustee (the "1.5 Lien Notes Trustee"). The 1.5 Lien Notes were secured by liens granted pursuant to mortgages, deeds of trust, and other collateral instruments executed and recorded in 2017. Such liens are junior in priority to the liens securing the Revolver and senior to the liens securing the 1.75 Lien Term Loan and remaining 2L Exchange Loan.

105.    Also on March 15, 2017, EXCO incurred an approximately $683 million 1.75 lien term loan (the "1.75 Lien Term Loan"), under a 1.75 lien term loan credit agreement,

32

dated March 15, 2017 ("1.75 Lien Credit Agreement"), by and among EXCO, as borrower, the EXCO guarantors party thereto, Wilmington Trust, National Association, as administrative agent and collateral trustee (the "1.75 Lien Agent"), and the lenders thereto, that included the option to pay interest in-kind in common shares or additional debt. The 1.75 Lien Term Loan was secured by liens granted pursuant to mortgages, deeds of trust, and other collateral instruments executed and recorded in 2017. Such liens are junior in priority to the liens securing the Revolver and the 1.5 Lien Notes and senior in priority to the liens securing the remaining 2L Exchange Loan.

106.    The exchange of the $300 million of the 2L Fairfax Term Loan and approximately $383 million of the 2L Exchange Loan for the 1.75 Lien Term Loan facilitated EXCO's incurrence of the 1.5 Lien Notes thereby further overleveraging EXCO's balance sheet.

107.    EXCO purchased a like amount of 2L Exchange Loan from the lenders of the 1.75 Lien Term Loan, and cancelled the 2L Term Loan.

108.    The 1.75 Lien Term Loan was created out of the two separate second lien debt facilities—the 2L Exchange Loan and the 2L Fairfax Term Loan. Accordingly, the 1.75 Lien Term Loan distinguished between debt issued in exchange for the 2L Exchange Loan and the 2L Fairfax Term Loan in certain respects. One distinction was that the 1.75 Lien Term Loan provided a different makewhole calculation for 1.75 lien debt attributable to the 2L Exchange Loan versus the 1.75 lien debt attributable to the 2L Fairfax Term Loan. In both cases, the original makewhole formula from the respective second lien debt facility was carried forward for 1.75 lien debt attributable to that facility.

109.    In connection with the 2017 Restructuring Transactions, EXCO also amended the 1L Credit Agreement to reduce the borrowing base from $285 million to $150 million, to permit the issuance of the 1.5 Lien Notes and the incurrence of the 1.75 Lien Term

33

Loan, and to modify certain financial covenants (the "RBL Amendments"). The RBL Amendments, together with the issuance of the 1.5 Lien Notes and the incurrence of the 1.75 Lien Term Loan, are the "2017 Refinancing Transactions."

L.   **Out-Of-Court Restructurings**
     **Fail and EXCO Files for Chapter 11.**



110.

111.

112.

113.

34

114. ███████████████████████████████

115.   Defendants have continued to interfere with EXCO's chapter 11 reorganization strategy even after the Petition Date. ███████████████████

35

116.  ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████ After EXCO informed them

that it had secured and was prepared to accept third party DIP financing, Fairfax and Bluescape

supplied their own DIP financing proposal. This proposal—although competitive on economic

terms—carried onerous case control provisions designed to hand control of the Debtors to

Fairfax and Bluescape. Although EXCO was able to negotiate out many of these provisions, a

number of the provisions remained in the final document submitted to the Court for its approval.

Only following the appointment of the Committee were some of the remaining provisions

mandating that the Debtors adhere to Fairfax and Bluescape's preferred path for the Chapter 11

Cases removed.

117.    On January 15, 2018, EXCO filed voluntary petitions under chapter 11 of

the Bankruptcy Code.  As of the Petition Date, EXCO, *inter alia*: (i) maintained the Revolver;

(ii) had approximately $317 million in aggregate principal outstanding on the 1.5 Lien Notes

(excluding any makewholes); (iii) had approximately $709 million of 1.75 Lien Term Loan

outstanding (excluding any makewholes); and (iv) had approximately $201 million in unsecured

notes outstanding.

M.      **The Debtors' Proposed Treatment of Secured
        Creditors Penalizes Plaintiffs for Defendants' Misconduct.**

118.    Prior to and during the Chapter 11 Cases, the Committee and the Debtors

conducted independent investigations into potential claims or causes of action the Debtors may

hold against third parties, including as against Defendants.  In the course of their investigations,

the Committee and the Debtors collected, reviewed, and produced a large volume of materials,

including documents and communications produced by Defendants.  The Committee also

36

conducted a number of depositions.  In connection with their investigation, the Debtors and the Committee analyzed various potential claims and causes of action including: (a) preference actions; (b) intentional and constructive fraudulent transfer actions; (c) recharacterization and equitable subordination claims; (d) breach of fiduciary duty claims; and (e) disallowance of original issue discount and makewhole claims, among others.

119.    On June 7, 2018, the Committee sent to the Debtors and certain creditors, including Defendants, a draft complaint (the "Draft Committee Complaint") alleging various claims and causes of action against certain of the Debtors' prepetition secured lenders, certain of the Debtors' current and former Board members, and the 1.5 Lien Notes Trustee and 1.75 Lien Agent.  The Committee alleged twenty-four claims and causes of action in the Draft Committee Complaint in connection with the 2015 Refinancing Transactions, the 2017 Refinancing Transactions, and certain actions by certain members of the Board during the period between 2015 and 2017.

120.    On July 18, 2018, the Debtors filed an *Emergency Motion for Telephonic Hearing to Appoint Mediator* [Docket No. 891] (the "Emergency Mediation Motion"), requesting the appointment of the Honorable Chief Judge David R. Jones to serve as mediator in the Chapter 11 Cases to facilitate a consensual resolution of outstanding issues.  The Debtors, with the consent of the Committee, Fairfax, and Bluescape, requested that Judge Jones be appointed to facilitate a mediation to commence on August 6, 2018 and continue from time to time thereafter.   Plaintiffs filed a limited objection [Docket No. 893] to the Emergency Mediation Motion seeking to participate in the mediation.  The Debtors, the Committee, Fairfax and Bluescape consented to allow Plaintiffs to participate in the mediation and to receive an unredacted copy of the Draft Committee Complaint subject to the Protective Order.  Following a

37

hearing on July 19, 2018, the Court entered an order appointing Judge Jones as mediator [Docket No. 894], with the scope, parties, time and procedures for the mediation to be determined by Judge Jones following consultation with the parties as he deemed appropriate.

121.    Mediation commenced on August 6, 2018, and continued on August 7, 2018, in Houston, Texas. Parties to the mediation included: (a) the Debtors; (b) each of the holders of the 1.5 Lien Notes; (c) holders of a super-majority of the 1.75 Lien Term Loan; (d) holders of a super-majority of the 2L Term Loan; (e) the Committee; (f) representatives of the Debtors' directors' and officers' liability insurers; and (g) counsel representing certain insureds under the directors' and officers' liability insurance. Plaintiffs also attended the mediation. A second round of mediation was held on August 27, 2018, and continued on September 21, 2018. Plaintiffs were not invited to the second round of mediation. The mediation resulted in an agreement in principle (the "Proposed Settlement") among the Debtors, the Committee, Fairfax, Bluescape and certain of the Debtors' directors' and officers' liability insurers on certain terms of a comprehensive restructuring transaction as reflected in the Proposed Plan (as defined below), as well as a resolution of potential claims and causes of action that were the subject of the Debtors' and the Committee's investigation and set forth in the Draft Committee Complaint.

122.    On October 1, 2018, the Debtors filed the *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1102 (the "Proposed Plan") and the accompanying disclosure statement [Docket No. 1103 (the "Disclosure Statement"). The Proposed Plan contains the terms of the Proposed Settlement. However, the Proposed Settlement as incorporated in the Proposed Plan does not properly allocate responsibility for Defendants' misconduct. Specifically, the Proposed Settlement does not

38

properly take into account Plaintiffs' position as secured lenders without any affiliation with any insider and without any involvement in Defendants' misconduct that gave rise to the Committee's threatened claims.  The Proposed Settlement purports to lump Plaintiffs in with Defendants who are the alleged bad actors, and seeks to impair Plaintiffs' (and other non-insider-affiliated secured creditors') recoveries on the same basis as Defendants' recoveries:

- As a part of the consideration under the Proposed Settlement, the unsecured creditors would receive 18% of the equity of the reorganized Debtors from the holders of the 1.75 Lien Term Loan claims.  However, that includes not only Defendants, but also other blameless secured creditors like Plaintiffs that are not affiliated with any present or former insiders of the Debtors and should not bear the cost of any settlement designed to secure a release of any claims arising from the misconduct of Defendants and their affiliated insiders.

- The Proposed Plan also requires that Plaintiffs effectively waive their 1.75 Lien Term Loan deficiency claims pursuant to the Proposed Settlement by excluding such claim from the general unsecured creditor class.  Plaintiffs should not be forced to give up their deficiency claims simply because other secured lenders (namely Defendants) are concerned they face significant liability for self-dealing and other misconduct.

- Under the Proposed Plan, only $13.35 million of the $15.35 million Unsecured Settlement Recovery (as defined in the Proposed Plan) contemplated by the Proposed Settlement is paid by the Debtors' directors' and officers' liability insurers.  The remaining $2 million will be paid by the Debtors.  The Debtors should not be using estate funds to pay the Proposed Settlement when such funds should be distributed to creditors in accordance with their priority.

39

## COUNT I
## EQUITABLE SUBORDINATION
(Pursuant to 11 U.S.C. § 510)

**(Against All Defendants)**

123.    Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

124.    Defendants' claims should be equitably subordinated to the claims of Plaintiffs in connection with the 1.5 Lien Notes and the 1.75 Lien Term Loan and as otherwise necessary or appropriate to ensure that Plaintiffs receive relief sufficient to remedy the harm caused by Defendants' inequitable conduct.

125.    Pursuant to 11 U.S.C. § 510(c), after notice and a hearing, the Court may equitably subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest, or order that any lien securing such a subordinated claim be transferred to the estate.

126.    The conduct of Defendants alleged herein constitutes inequitable conduct. Such conduct was intended to provide Defendants with excess benefits to the detriment of Plaintiffs.

127.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████

128.    The inequitable conduct of Defendants alleged herein was not disclosed to, or otherwise known by, Plaintiffs in their capacity as investors in the 1.5 Lien Notes, the 1.75

40

Lien Term Loan, the 2L Exchange Loan or otherwise, at or prior to the time Plaintiffs purchased 1.5 Lien Notes and exchanged their 2L Exchange Loan holdings for a like amount of 1.75 Lien Term Loan holdings.

129.    The Debtors' Proposed Plan, which effectuates the Proposed Settlement and is a direct consequence of Defendants' misconduct, improperly impairs Plaintiffs' recoveries in order to subsidize and pay for Defendants to obtain a release and settlement of the claims arising from their misconduct.   Specifically, the Proposed Plan and Proposed Settlement contemplate that all 1.75 Lien Term Loan lenders' recoveries under the Proposed Plan will be impaired and all such secured creditors will waive their 1.75 Lien Term Loan deficiency claims in order to fund the consideration going to unsecured creditors in exchange for settling and releasing claims as against Defendants and their insider affiliates.   This proposed impairment of Plaintiffs and other non-insider-affiliated secured creditors is improper.   It is the misconduct of Defendants and their affiliated representatives that gave rise to the claims at issue, and Plaintiffs and other disinterested secured creditors should not be forced to subsidize or otherwise contribute to any settlement designed to release and resolve claims arising from Defendants' misconduct.   Any ultimate treatment of Plaintiffs must be on the basis of their status as secured lenders without any affiliation with insiders and who have not engaged in any of the misconduct or self-dealing that forms the basis of the Committee's claims and causes of action.

130.    Due to the inequitable conduct of Defendants alleged herein, the recovery of Plaintiffs, as holders of 1.5 Lien Notes and 1.75 Lien Term Loan lenders, has been improperly impaired.

131.

132.     Equitable subordination of the claims of Defendants to the claims of Plaintiffs in connection with the 1.5 Lien Notes and the 1.75 Lien Term Loan is consistent with the Bankruptcy Code.

133.     Because of the transactions and actions described herein, the claims of Defendants should be equitably subordinated to Plaintiffs' claims pursuant to section 510 of the Bankruptcy Code.

## ATTORNEYS FEES AND COSTS

134.     To the extent allowable by applicable law, Plaintiffs request that the Court award reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiffs request that the Court grant the following relief:

a.     entering a judgment against Defendants finding that they engaged in inequitable conduct pursuant to 11 U.S.C. § 510; and

b.     subordinating the claims of Defendants to the claims of Plaintiffs in connection with the 1.5 Lien Notes and 1.75 Lien Term Loan.

42

Dated: October 12, 2018

Respectfully submitted,

WHITE & CASE LLP

By: /s/ *Thomas E Lauria*

Thomas E Lauria (State Bar No. 11998025)
Michael C. Shepherd (admitted *pro hac vice*)
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5700
tlauria@whitecase.com
mshepherd@whitecase.com

- and -

WHITE & CASE LLP
Gregory M. Starner (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
gstarner@whitecase.com

*Attorneys for Gen IV Investment Opportunities,*
*LLC and VEGA Asset Partners, LLC*

43